Filed 2/22/24  In re E.O. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.O. et al., Persons Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>R.O.,<br><br>    Defendant and Appellant. | F086879<br><br>(Super. Ct. No. JD140336-01, JD140337-01)<br><br>**OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from orders of the Superior Court of Kern County.  Christie Canales Norris, Judge.

Susan M. O'Brien, under appointment by the Court of Appeal, for Defendant and Appellant.

Margo A. Raison, County Counsel, and Jennifer E. Feige, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Levy, Acting P. J., Detjen, J. and Peña, J.

Appellant R.O. (father) is the father of K.O. and E.O. (collectively, the children), who are the subjects of this dependency case. Father challenges the juvenile court's orders issued at a jurisdiction and disposition hearing where the children were ordered to remain in the parents' custody under a plan of family maintenance. Father contends the court's jurisdictional findings are not supported by substantial evidence. We affirm.

## FACTS

### *Initial Removal*

On July 6, 2023, the Kern County Department of Human Services (department) received a suspected child abuse report that both parents were arrested and no other caregivers were available for the children. The children were taken into protective custody by law enforcement, and a social worker from the department was assigned for further investigation.

The social worker spoke to the children on the following day through video chat due to a positive test for COVID-19. K.O., at eight years of age, did not initially speak to the social worker, but he would nod his head in agreement. K.O. eventually explained that he lived in a house with E.O. and his parents. His seventeen-year-old sister, B.O., lived with their grandmother, and he also had a twelve-year-old brother, Z.O. K.O. reported that he was never hungry at home. He recalled the events that led to him witnessing his parents' arrest.

K.O. disclosed that his parents pushed each other during fights, and E.O. cried when his parents pushed each other. Law enforcement had been to his home on two prior occasions, and he stayed with his grandmother after the police came. K.O. claimed he felt safe with his parents because they protected him from Z.O. He reported that Z.O. would "make[] fires." E.O., at five years of age, was interviewed by the social worker after K.O. woke him up. He indicated that he lived in a motel with his parents and K.O. for " 'a long time.' " Z.O. stayed at the motel as well.

2.

The maternal grandmother confirmed that B.O. and Z.O. were staying with her. B.O. had been staying at the maternal grandmother's home before mother and father were arrested. Z.O. was picked up from the motel by the maternal grandmother after mother and father were arrested. B.O. went back and forth between parents and maternal grandmother, but she had not seen the parents as much lately. The maternal grandmother's only concern was that the parents were not working or "moving forward" in life. Maternal grandmother was able to care for B.O. and Z.O. temporarily, but she could not also care for E.O. and K.O. B.O. and Z.O. had stayed with the maternal grandmother for six months during prior dependency proceedings.

The social worker interviewed mother at her place of incarceration. Mother explained that they were going to a store, and law enforcement was called when they ran a red light. Law enforcement arrested mother and father for the robbery of another store on a different date, but mother denied committing the robbery. Z.O. was back at the motel at the time of the arrest, and she called the maternal grandmother from jail to have him picked up. Mother reported that her family was unhoused for the past two years, and they were currently living in a motel. The family intended to move into a new place, but her incarceration prevented them from doing so. B.O. went back and forth between the motel and grandmother's home. Mother admitted to a history of methamphetamine use three years earlier, but she denied any recent use of drugs or alcohol. She also denied there was any physical violence or mental health issues in the home.

Father also spoke to the social worker while he was incarcerated. He indicated that the family was living in different motels, but they were going to move into a home. Father claimed sobriety since previous dependency proceedings when he was using methamphetamines. Any current substance abuse was denied, but father acknowledged eating marijuana edibles "every couple of days" for pain. He also denied there were any issues with domestic violence or mental health.

B.O. and Z.O. were both interviewed by the social worker at the maternal grandmother's home. B.O. indicated that she would go back and forth between the parents' motel rooms and maternal grandmother's home. Her parents moved from motel to motel, and she preferred to stay with the maternal grandmother. She denied that either parent used drugs, but father would drink alcohol on special occasions. B.O. was not aware of any marijuana use by either parent, and she claimed her parents had not fought since 2020. Z.O. did not like having to move from motel to motel, and his parents allowed him to stay at the motel by himself. He explained that there was no food to eat approximately three times per week. Z.O. was not aware of any drug or alcohol use by his parents. His parents "mostly" got along, but they would yell.

Law enforcement informed the social worker that a call came in about a vehicle that ran a red light at a high rate of speed. The reporting party witnessed children who were unrestrained in the back seat of the vehicle. The parents were the registered owners of the vehicle, and there was a warrant for their arrest. The parents did not inform law enforcement that another child was left alone at the motel.

The manager of the motel allowed a social worker to observe the parents' motel room. He indicated that mother left without paying, and she left her belongings behind. The motel room had been cleaned by motel staff but it was still a mess. Photographs of the motel room showed stacks of clothing and a social worker observed a "bong" and bottle of cooking oil on top of the refrigerator.

On July 10, 2023, the social worker conducted separate interviews of E.O. and K.O. K.O. told the social worker that he was in the back seat of the car when his parents drove to the store, and he claimed that he was wearing a seat belt. K.O. also reported that E.O. was in a car seat and wearing a seat belt. He also claimed the vehicle was driving at a regular speed. E.O. indicated that he was in a car seat, but he also admitted that he and K.O. were "bouncing around" in the back seat of the car.

4.

On July 10, 2023, the department filed original petitions alleging the children were described by Welfare and Institutions Code section 300, subdivisions (b)(1) and (g).[1]  The petitions alleged that the children were at substantial risk of suffering serious physical harm as a result of mother and father's willful or negligent failure to provide them with adequate food.  The petition further alleged that mother and father were incarcerated and unable to arrange for the care of the children.

The department's detention report detailed mother and father's child welfare history, which dated back to 1998.  In September 1998, there were two referrals involving hazardous conditions and a lack of food in father's home.  During the investigation of one of the referrals, father admitted to using drugs prior to a recent car accident.  In 2003, two of mother's children were placed under a legal guardianship after her arrest for being under the influence of methamphetamine.  In 2013, there were two referrals for general neglect, alleging mother and father had no food in their home.  In response to the referrals, mother and father moved to a new residence that was clean and stocked with adequate food, and a referral was made to "differential response" services[2] to assist the family.

An allegation of general neglect was substantiated in February 2015, after mother and K.O. tested positive for amphetamines at the time of his birth.  Mother and father accepted differential response services, and mother was to enroll in substance abuse counseling.  In July 2016, there was a substantiated referral for general neglect against mother and father due to unsafe home conditions while the family lived in a garage that was converted into a bedroom.  The next month, mother fell asleep in the converted

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    Differential response services are voluntary services provided in situations that do not call for the filing of a dependency petition.  (See § 10609.9, subd. (a)(1)(D); see also <https://www.cdss.ca.gov/inforesources/child-welfare-protection/differential-response> [as of Feb. 22, 2024].)

garage with a lit cigarette that burned down the house.  In October 2016, allegations of general neglect were substantiated against mother and father because the conditions of their home were "deplorable" and there was no food.  K.O. was also found wandering a busy street without adult supervision.

A dependency petition was filed in October 2019, after the children were inside "an extremely dirty vehicle with no food and no car seats."  The petition alleged mother and father were unhoused and living in their car with the children between motel stays.  It further alleged that the parents had a chronic history of homelessness and father had used methamphetamine.  The allegations were found true and the children were placed with the parents under a plan of family maintenance services.  Dependency jurisdiction was terminated in August 2020.  In October 2022, a referral alleged that the family's motel room and car were filled with trash.  Later that month, a referral was received after K.O. was injured in a car accident while not wearing his seat belt.

At the initial detention hearing held on July 11, 2023, the juvenile court made temporary detention findings and continued the hearing at the request of mother's counsel.  At the continued detention hearing on July 13, 2023, the children were ordered detained from mother and father, and a jurisdiction and disposition hearing was set for August 3, 2023.

***Jurisdiction and Disposition***

On August 3, 2023, the department filed a jurisdiction report, along with a separate disposition report.  The jurisdiction report recommended that the allegations pursuant to section 300, subdivision (b)(1) be found true.  The department requested that the allegations involving the parents' incarceration, pursuant to section 300, subdivision (g), be dismissed without prejudice.  The disposition report recommended that the children remain in out-of-home care, with family reunification services provided to both parents.  As part of their case plan, both parents were to participate in counseling for parenting, submit to random drug testing, and provide a clean and safe environment for the children.

Father tested positive for alcohol and cannabis during a drug test for the department on July 13, 2023.  Both parents were released from jail, and all charges against father were dropped.  The parents participated in supervised visits with the children without any concerns.  Mother and father received assistance in getting a home shortly after their release, and a social worker went to inspect the home on July 21, 2023.  There was running water and ample food in the home, but items of trash on the side of the home were a noted safety concern.  Father indicated that he would have the items removed.

At the jurisdiction and disposition hearing held on August 3, 2023, mother and father were both present and represented by counsel.  The department indicated that it was prepared to recommend family maintenance services for both parents.  The parties accepted offers of proof that both parents would testify that their current housing had a one-year lease.  Counsel for father requested that the juvenile court decline taking jurisdiction because "the issues have been remedied."  Counsel for the children and department argued that the parents' history of struggling to maintain adequate housing was sufficient for the court to exercise jurisdiction.

After hearing argument from counsel on jurisdiction, the juvenile court stated as follows:

> "I am very happy … [¶] that you guys have gotten this far.  You guys really scrambled quickly and got— through resources that [you] guys were able to access with the help of the department, you guys were able to get housing with the food supply.  But I do agree that because of this history, I wanna make sure that this is something that's gonna have some lasting effects and so based on the history, I do believe that the children are at substantial risk, so, at this time, I am gonna take jurisdiction."

The allegations pursuant to section 300, subdivision (b)(1) were found true.  As to disposition, the parties submitted on the department's recommendation for family maintenance services.  The juvenile court proceeded to order the children placed with

mother and father, and family maintenance services were to be provided according to the proposed case plan. Father filed a timely notice of appeal on September 19, 2023.

## DISCUSSION

Father contends the juvenile court erred because there was no evidence of a substantial risk at the time of the jurisdiction hearing because his new home had adequate food. He also argues that there was no substantial evidence that the children were at substantial risk of serious physical harm due to a failure to provide adequate food.

### A.      *Legal Principles*

Section 300, subdivision (b) provides that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of … [¶] [t]he failure or inability of his or her parent or guardian to adequately supervise or protect the child." (§ 300, subd. (b)(1)(A).)

A finding under section 300, subdivision (b)(1) requires three elements: " (1) one or more of the statutorily specified omissions in providing care for the child …; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561; *In re R.T.* (2017) 3 Cal.5th 622, 626–628 (*R.T.*) "Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215–1216.) Thus, the juvenile court "may consider past events in deciding whether a child presently needs the court's protection." (*Id*. at p. 1216.)

While "evidence of past conduct may be probative of current conditions, the court must determine 'whether circumstances at the time of the hearing subject the minor to the defined risk of harm.' [Citations.] Evidence of past conduct, without more, is insufficient to support a jurisdictional finding under section 300. There must be some

reason beyond mere speculation to believe the alleged conduct will recur." (*In re James R.* (2009) 176 Cal.App.4th 129, 135–136, italics omitted, abrogated on another ground in *R.T.*, *supra*, 3 Cal.5th at p. 628.)

### B. Standard of Review

A juvenile court's jurisdictional findings are reviewed using the substantial evidence standard of review, where we determine whether evidence of reasonable, credible, and solid value supports the court's findings. We do not reweigh the evidence, nor do we consider matters of credibility. (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199–200.) " '[W]e must uphold the [juvenile] court's [jurisdictional] findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings.' " (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.)

### C. Analysis

Father contends the juvenile court's jurisdictional findings are not supported by substantial evidence. He emphasizes the fact that the children were being provided adequate food and housing at the time of the jurisdiction hearing. Thus, father argues his prior act of neglect was insufficient to establish a substantial risk of future harm, with citation to *In re Emily L.* (2021) 73 Cal.App.5th 1. We reject father's contention that *Emily L.* compels a conclusion that substantial evidence is lacking here.

In the case of *Emily L.*, the family's circumstances had "undergone epic changes" by the time of the jurisdiction hearing. (*In re Emily L.*, *supra*, 73 Cal.App.5th at p. 15.) The physical altercation between Emily and her mother that led to dependency proceedings in that case had occurred in October 2019. (*Id*. at p. 5.) By the time of the jurisdiction hearing, held 14 months later in December 2020,—at which the mother, father and Emily all asked that the dependency petition be dismissed—Emily had made a "remarkable transformation." (*Id*. at p. 16.) "[T]here was no evidence Emily was still

9.

quick to anger, prone to violence, smoking marijuana, ditching school, staying out overnight without permission, or disrespecting her parents and their rules.… And there was certainly no evidence that a violent altercation like the one Emily precipitated with [her mother] in October 2019 would occur again." (*Id*. at pp. 15–16, fn. omitted.) Thus, the court of appeal ruled, the evidence relied upon by the juvenile court to support jurisdiction was stale, and there was no risk of future harm. (*Id*. at p. 16.)

Here, the evidence of a continuing risk of harm was far from stale. The parents had lived at their new residence for less than a month, and previous attempts to provide parents with housing assistance through differential response services had failed. Prior to the jurisdiction and disposition hearing, the department determined that mother and father's new residence had adequate food and safe conditions. However, the record supports the juvenile court's view that the parents' longstanding history of providing inadequate food and housing for their children necessitated ongoing court supervision.

"The [juvenile] court may consider past events in deciding whether a child presently needs the court's protection. [Citation.] A parent's ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.)" (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215–1216.)

The department had already been contacted regarding the family's unstable housing in the past year, and less than three years had elapsed since prior dependency proceedings involving the parents' failure to provide adequate food and housing. At the time of the parents' recent arrest, the children's 12-year-old sibling was left alone in a cluttered motel room, with drug paraphernalia within his reach. Although mother and father had shown an ability to maintain minimal standards in their new home for a couple of weeks, the juvenile court was not required to ignore their lengthy history of failing to maintain adequate food and housing for their children.

Next, father's contention that the children did not complain about being hungry at home overlooks the limited role of a reviewing court. Contrary to father's assertions, when reviewing a record for substantial evidence, as we are required to do here, we do not reweigh evidence or substitute our judgment for that of the finder of fact. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450–451.) In reviewing the sufficiency of the evidence, we uphold a finding even if there was evidence to support a contrary conclusion if the "substantial evidence" standard is satisfied. (See *In re Megan S.* (2002) 104 Cal.App.4th 247, 251.) The parents' child welfare history demonstrated a longstanding pattern of general neglect in relation to adequate food and housing for their children. Accordingly, the juvenile court could reasonably conclude on these facts that court supervision was required to ensure that the children did not suffer serious physical harm or illness in the near future.

Finally, we reject father's suggestion that "without proof of harm, there was not substantial evidence of a substantial risk of harm." The absence of any actual harm being inflicted on the children due to the lack of food is irrelevant, as subdivision (b)(1) only requires a "substantial risk" that the child will be harmed. "[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction." (*In re I.J.* (2013) 56 Cal.4th 766, 773.) " 'The purpose of dependency proceedings is to prevent risk, not ignore it.' " (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.)

In further support of his argument, father cites to the case of *In re M.D.* (2023) 93 Cal.App.5th 836. In *M.D.*, the child was observed crawling out of the window of the home while her father was not present. The child was found unsupervised, wandering in the apartment complex. (*Id*. at p. 851.) The father was unable to be reached by phone for several hours after law enforcement made contact with the child. (*Ibid.*) The father had historically left the child unsupervised on several occasions for extended periods of time without arranging adult supervision. (*Ibid.*) There was dry food on the shelves, but the

11.

child had taken to eating dog biscuits while being left to fend for herself. (*Id*. at p. 853.) The child also exhibited " 'food insecurity behaviors,' " such as believing someone would take her food and shoving food into her mouth quickly. (*Id*. at p. 844.) The reviewing court concluded that the substantial risk to the child created by the father's "negligent disregard of her basic needs continued to exist at the time of the jurisdictional hearing." (*Id*. at pp. 854.) Thus, the appellate court determined substantial evidence supported the finding that the father's negligent conduct was sufficient to impose jurisdiction. (*Id*. at p. 854.)

In the present case, substantial evidence established that father failed to provide adequate food and shelter on multiple occasions, not merely once during an isolated incident. (See *R.T.*, *supra*, 3 Cal.5th 622, 630 [observing that a parent's negligent conduct is sufficient to impose jurisdiction based on willful or negligent failure to provide adequate food, clothing, shelter, or medical treatment].) The outcome of other dependency cases involving more severe neglect is not determinative of the substantial risk that the children were exposed to in the present case. Repeated past instances of neglect were relevant to the juvenile court's determination of whether the children presently needed the court's protection. (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.) " '[A] measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child.' " (*In re Jasmon O.* (1994) 8 Cal.4th 398, 424.)

Accordingly, father's history of struggling to maintain the conditions of the children's home, combined with a report that the children were recently lacking food for three days out of the week, comprise substantial evidence to support the juvenile court's finding that there was a substantial risk that the children would suffer serious physical harm. Similar to the circumstances in *M.D.*, the court "could reasonably conclude on these facts that the substantial risk to [the children] created by [f]ather's negligent disregard of [their] basic needs continued to exist at the time of the jurisdictional hearing." (*In re M.D.*, *supra*, 93 Cal. App. 5th at p. 854.) Drawing all reasonable

inferences from the record, we conclude substantial evidence supports the court's finding that father's conduct placed the children at a substantial risk of suffering serious physical harm or illness, warranting dependency jurisdiction.

## DISPOSITION

The juvenile court's orders are affirmed.